IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 13-cv-01905-LTB

LADEAN S. LANDREVILLE,

    Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

    Defendant.
_____

ORDER
_____

    Plaintiff Ladean Landreville appeals the final decision of the Commissioner of Social Security ("SSA") denying her application for disability benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.*, and for supplemental security income under Title XVI of the act, 42 U.S.C. § 1381, *et seq.*  I have considered the opening and response briefs [Docs. # 13, 14] and the administrative record [Doc. # 7] ("AR").  Ms. Landreville did not file a reply.  Oral argument would not materially assist me in determining this appeal.

    Ms. Landreville's sole argument is that the administrative law judge ("ALJ") erred in finding that her posttraumatic stress disorder ("PTSD") is not a severe impairment at step two of SSA's sequential evaluation process.  I conclude that the ALJ properly applied SSA's regulations for evaluating the severity of mental impairments and that his findings are supported by substantial evidence.  I also conclude that, even if the ALJ had erred, any error was harmless.  Accordingly, I AFFIRM.

## I. Background

### A. Procedural History

On April 30, 2009, Ms. Landreville filed her claim for disability benefits with SSA, alleging that she became disabled on April 1, 2005.  AR 17.  SSA denied her claim initially on December 3, 2009.  *Id.*  Ms. Landreville requested a hearing, which took place on September 9, 2011 before an ALJ.  *Id.*  After the hearing, Ms. Landreville amended her alleged onset date to March 19, 2008.  *Id.*  On March 7, 2012, the ALJ denied Ms. Landreville's claim, concluding that she was not disabled within the meaning of the Social Security Act.  AR 28.  Ms. Landreville requested that SSA's Appeals Council review the ALJ's decision.  AR 13.  On May 20, 2013, the Appeals Council denied review, making the ALJ's decision the final decision of SSA.  AR 1; *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).  On July 18, 2013, Ms. Landreville timely filed the instant appeal [Doc. # 1].  I have jurisdiction pursuant to 42 U.S.C. § 405(g).

### B. Ms. Landreville's Alleged Disability

Ms. Landreville alleged other disabilities below, but appeals only with respect to her alleged PTSD.  The following facts relate to that condition and are undisputed.

Ms. Landreville is a 53-year-old woman.  AR 197.  Her alleged PTSD arises out of domestic violence she experienced in 2005 and 2006.  In late 2005, her boyfriend choked her during a drunken brawl.  AR 345.  In October 2006, she got into an argument with her boyfriend in which he "body slamm[ed] her in the house, threw her on the bed, [and] said he was going to go to hell and tak[e] her with him."  *Id.*  Then, in an argument one or two days later, "it apparently became so dangerous and she was so frightened that she eventually was able to get to a girlfriend's house and actually called the police."  *Id.*  The boyfriend was arrested and

charged. *Id.*

After a court proceeding she attended around Thanksgiving of 2006 in relation to those charges, Ms. Landreville "became incoherent, could not talk, became mute, and would not get out of bed." *Id.* She was admitted to the hospital and transferred to the West Slope Mental Health Stabilization Center in Grand Junction, Colorado, where she was evaluated by psychiatrist Lowell Stratton, M.D. She reported experiencing nightmares and flashbacks, apparently regarding the domestic violence episodes. AR 346. She also reported having recently dissociated twice. *Id.* She felt she "lost the whole day" during both episodes. *Id.* Dr. Stratton diagnosed her with "a major issue of PTSD" and concluded that "she has had at least two dissociative episodes." AR 347.

Dr. Stratton assessed Ms. Landreville's "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" known as the Global Assessment of Functioning Scale ("GAF"). *Id.*; Amer. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders at 32 (4th ed. 1994) ("DSM-IV"). Dr. Stratton assigned Ms. Landreville a score of 25, and noted that she had scored as high as 70 in the past year. AR 347. A GAF score of 25 indicates that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (*e.g,.* sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (*e.g.,* stays in bed all day; no job, home, or friends)." DSM-IV at 32. A score of 70, by contrast, indicates "[s]ome mild symptoms (*e.g.,* depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.,* occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* Dr. Stratton determined that Ms. Landreville did not meet the criteria for

3

inpatient hospitalization. AR 347. He discharged her to her home and recommended that she continue with outpatient therapy. *Id.*

On February 1, 2007, Ms. Landreville's therapist, Constance Converse, M.A., noted the recent hospitalization and advised that Ms. Landreville not seek employment because she "has been unable to afford to be evaluated for medication, and is struggling daily to maintain her stability." AR 762. Ms. Converse advised that, while Ms. Landreville should not "be involved with an employment search" in order to focus on her treatment, she "can, and will be, employable" after completing treatment. *Id.* On March 8, 2007, Ms. Converse noted Ms. Landreville's "reported difficulties with episodes of memory loss, migraines and headaches, stuttering, difficulty expressing her words." AR 537. Ms. Converse recommended that Ms. Landreville see a medical doctor so "the medical component of her distress" could be addressed. *Id.*

Ms. Landreville followed that advice. On March 12, 2007, she saw physician Linda Peterson, M.D. AR 515. Ms. Landreville reported having "a few panic attacks at night time," which she said were relieved by the anti-anxiety medication Xanax. *Id.* Dr. Peterson diagnosed her with anxiety, depression, and panic attacks, and prescribed her Xanax and the antidepressant Celexa. *Id.* On January 7, 2008, Ms. Landreville began seeing providers at the Marillac Clinic in Grand Junction. AR 608. Tina Cordero-Rosati, P.A., diagnosed her with PTSD, depression, and anxiety on January 7, 2008, and again on March 3, 2008. AR 602, 610.

On May 16, 2008, Ms. Landreville saw psychiatrist Jarl Dyrud, M.D. at the Marillac Clinic. AR 618. She complained of anxiety stemming from issues in her children's lives and from her current relationship, which she said "does not seem to be really going anywhere." AR

4

619. She reported that Xanax helped with her anxiety. *Id.* Dr. Dyrud noted that Ms. Landreville was "eating and sleeping well"; that on examination she had a bright affect, euthymic mood, no racing thoughts, good attention, good concentration, intact memory, intact cognition, fair insight, and fair judgment; and that she was "hopeful [and] future oriented," although she was "on the anxious side of things." *Id.* Dr. Dyrud diagnosed her with a GAF score of 65 and anxiety disorder. *Id.* A GAF score of 65—like the score of 70 Ms. Landreville received before her 2006 hospitalization—indicates "[s]ome mild symptoms (*e.g.,* depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *See* DSM-IV, *supra*, at 32.

In a May 28, 2009 "Function Report" Ms. Landreville submitted in support of her benefits application, she described limitations on her ability to do certain activities, but those limitations are almost all physical. AR 249-56. For example, she said she "use[d] to pay bills on [the] computer" but "can't sit up so I can't do them now." AR 252. But she stated she could count change, use a checkbook, and handle a savings account. *Id.* And she said her conditions did not affect her ability to see, talk, hear, complete tasks, understand, remember, follow instructions, or get along with others. AR 254. Ms. Landreville reported socializing with others on the telephone and going to doctor's appointments and Walmart on a regular basis. AR 253. Ms. Landreville did report having trouble remembering detail, handling stress, and handling changes in routine. AR 254-55. She indicated that she used Xanax for stress, however. AR 255. At an October 19, 2009 office visit related to a lumbar surgery, Ms. Landreville reported that "[s]he just came back from being up in the hills hunting for about a month." AR 715. Her

doctor noted she "is quite active." *Id.*

In December 2009, state agency medical consultant Alberta Ziomek, M.D., reviewed Ms. Landreville's file. AR 328. Dr. Ziomek opined that Ms. Landreville's PTSD and other alleged mental impairments were not severe. AR 328, 333. Dr. Ziomek indicated that this was because Ms. Landreville's mental impairments did not restrict her activities of daily living; did not cause difficulties in maintaining social functioning; caused only mild difficulties in maintaining concentration, persistence, or pace; and had not caused any episodes of decompensation of extended duration. *Id.*

The ALJ held a hearing on September 9, 2011. Ms. Landreville and her counsel focused on her alleged physical impairments and did not raise the issue of PTSD. At the end of the hearing, Ms. Landreville's attorney asked her if "there [is] anything that has not been said here today, that you would like [the ALJ] to know, as he considers your application for disability." AR 94. Ms. Landreville described pain as a result of degenerative disc disease, but did not mention PTSD. AR 94-95. It appears the only testimony with any relation to PTSD is Ms. Landreville's testimony that she suffered with anxiety. AR 84 (Ms. Landreville explaining that "I just feel really stressed out" and "feel like I'm not able to control my thoughts"); AR 88 (Ms. Landreville complaining that her doctor has not given her anxiety medication out of concern that she would "become addicted to it"). Ms. Landreville also noted that she is "not depressed, but sad" because her "condition" prevents her from working. AR 93.

## II. Legal Standards

### A. SSA's Five-Step Process for Determining Whether a Claimant Is "Disabled"

A claimant is "disabled" under Title II and Title XVI of the Social Security Act if she is

unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). SSA has established the following five-step sequential evaluation process for determining whether a claimant is disabled and thus entitled to benefits. The process applies to Title II and Title XVI claims alike. *See* 20 C.F.R. §§ 404.1520, 416.920.

At step one, SSA asks whether the claimant is presently engaged in "substantial gainful activity." *Id.* §§ 404.1520(b), 416.920(b). If she is, benefits are denied and the inquiry stops. *Id.* At step two, SSA asks whether the claimant has a "severe impairment," or one that "significantly limits [her] physical or mental ability to do basic work activities." *Id.* §§ 404.1520(c), 416.920(c). If she does not, benefits are denied and the inquiry stops. *Id.* If she does, SSA moves on to step three, where it determines whether the claimant's impairment(s) "meet or equal" one of the "listed impairments"—impairments so severe that SSA has determined that a claimant who has them should be determined conclusively disabled without regard to the claimant's age, education, or work experience. *Id.* §§ 404.1520(d), 416.920(d). If not, SSA goes to step four.

At step four, SSA determines the claimant's residual functional capacity ("RFC"), *i.e.,* what she is still able to do despite her impairments, and asks whether the claimant can do any of her "past relevant work" given that RFC. *Id.* §§ 404.1520(e), 416.920(e). If not, SSA goes to the fifth and final step, where it has the burden of showing that the claimant's RFC allows her to do other work in the national economy in view of her age, education, and work experience. *Id.*

§§ 404.1520(g), 416.920(g). At this step, SSA's "grid rules" may mandate a finding of disabled or not disabled without further analysis based on the claimant's age, education, and work experience. 20 C.F.R. Pt. 404, Subpt. P, App. 2; 20 C.F.R. § 416.969. In contrast with step five, the claimant has "the burden of establishing a prima facie case of disability at steps one through four." *Doyal,* 331 F.3d at 760.

**B. SSA's "Special Technique" for Determining Severity of Mental Impairments**

Whenever SSA evaluates the severity of a mental impairment in an adult claimant, it applies a "special technique" that is outlined in its regulations. *See* 20 C.F.R. §§ 404.1520a (Title II), 416.920a (Title XVI). Under the special technique, SSA "must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment." *Id.* §§ 404.1520a(b)(1), 416.920a(b)(1). If so, SSA then rates the "degree of functional limitation" caused by the impairment(s) in "four broad functional areas." *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). These areas are (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Id.* For the first three areas, SSA assigns a rating of none, mild, moderate, marked, or extreme. *Id.* §§ 404.1520a(c)(4), 416.920a(c)(4). For the fourth area, SSA determines how many episodes of decompensation the claimant has had and assigns one of the following ratings: none; one or two; three; or four or more. *Id.* If the claimant is assigned ratings of "none" or "mild" in the first three areas and SSA determines she has had no episodes of decompensation, SSA "will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). If, by contrast, the mental impairment is severe, SSA

proceeds in the sequential evaluation process described above and considers whether the claimant's mental impairment is sufficiently severe to meet or equal a listed impairment, and, if not, to evaluate her residual functional capacity. *Id.* §§ 404.1520a(d)(2)-(3), 416.920a(d)(2)-(3); *see also supra* § II.A.

### C. Standard for Reviewing SSA's Decision

My review is limited to determining whether SSA applied the correct legal standards and whether its decision is supported by substantial evidence in the record. *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000). With regard to the law, reversal may be appropriate when SSA either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir. 1996). With regard to the evidence, I must "determine whether the findings of fact . . . are based upon substantial evidence, and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon [this] court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The record must demonstrate that the ALJ considered all of the evidence, but the ALJ is not required to discuss every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). I may not re-weigh the evidence or substitute my judgment for that of the ALJ. *See Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987); *Cagle v.*

*Califano*, 638 F.2d 219, 220 (10th Cir. 1981).

### III.  The ALJ's Decision

The ALJ followed the five-step analysis outlined above.  At step one, the ALJ found that Ms. Landreville has not engaged in substantial gainful activity since the amended alleged onset date of her condition, March 19, 2008.  AR 19.  At step two, the ALJ found only one severe impairment, degenerative disc disease, which is not at issue in this appeal.  AR 19-22.  The ALJ found that Ms. Landreville's PTSD was not severe.  *Id.*  The ALJ analyzed the severity of Ms. Landreville's PTSD in accordance with the special technique for evaluating mental impairments. *Id.*  At step three, the ALJ concluded Ms. Landreville did not meet or equal any listed impairment.  AR 22.  At step four, the ALJ assessed Ms. Landreville's RFC and determined that her RFC allowed her to perform past work as an administrative clerk.  AR 22-27.  Accordingly, the ALJ did not reach step five.  Based on these conclusions, the ALJ determined that Ms. Landreville was not disabled.  AR 27-28.

### IV.  Analysis

Ms. Landreville's sole contention is that the ALJ erred in concluding at step two that her PTSD is not a severe impairment.  She seeks reversal of SSA's decision on this basis and requests that the Court instruct SSA to award of benefits or, alternatively, remand this case to SSA for further proceedings.

Ms. Landreville does not acknowledge the special technique used for evaluating the severity of mental impairments at step two.  Instead she argues that her PTSD "significantly limits [her] ability to perform basic work activities," apparently referencing the general standard for determining the severity of impairments.  Pl.'s Opening Br. at 3 [Doc. # 13].  But the ALJ

"must evaluate the effect of a claimant's mental impairments on her ability to work using [the] 'special technique' prescribed by the Commissioner's regulations." *Wells v. Colvin*, 727 F.3d 1061, 1064 (10th Cir. 2013). Accordingly, I will analyze the ALJ's decision within the framework of the special technique.

At step two, the ALJ explained that he considered Ms. Landreville's degree of limitation in the four broad functional areas prescribed by the special technique. AR 20. The ALJ found that Ms. Landreville had no limitation in the first two areas: activities of daily living and social functioning. *Id.* The ALJ found only mild limitation in the third area: concentration, persistence or pace. *Id.* The ALJ found no record evidence of the fourth criterion: episodes of decompensation. *Id.* The ALJ correctly noted that findings of mild or none in the first three areas coupled with a finding of none in the fourth area generally mandate the conclusion that the claimant's impairment is not severe. AR 21 (citing 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1)).

I conclude that there is substantial evidence in the record to support the ALJ's findings in each of these areas. I begin with activities of daily living and social functioning. There is little doubt that Ms. Landreville was limited in these areas in 2006, after she was attacked by her boyfriend. For example, shortly after the attack, Dr. Stratton assigned her a GAF score of 25, indicating she may have had "serious impairment in communication or judgment" or "inability to function in almost all areas." DSM-IV at 32; AR 347. Further, Ms. Landreville's therapist, Ms. Converse, recommended in February 2007 that Ms. Landreville not seek employment at that time. AR 762. Records contemporaneous with the amended alleged onset date of March 19, 2008, however, support the conclusion that Ms. Landreville is no longer limited in these areas.

For example, Dr. Dyrud assigned her a GAF score of 65 in May 2008, which indicates "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." AR 619.

Further, in May 2009, Ms. Landreville reported being able to do such activities of daily living as managing her money and going to Walmart and doctor's appointments. AR 252-53. In the same report, she reported socializing with others on the telephone. AR 253. She also indicated that her condition does not affect her ability to get along with family, friends, neighbors, and authority figures. AR 254-55. In October 2009, Ms. Landreville told her doctor she had just returned from a month-long hunting trip. AR 715. In December 2009, Dr. Ziomek, the state agency medical consultant, concluded that Ms. Landreville was not limited in activities of daily living or social functioning. AR 338. Based on this evidence, which the ALJ noted in his decision, I am satisfied that his finding that Ms. Landreville is not limited in these areas is supported by substantial evidence.

I turn next to the ALJ's finding that Ms. Landreville has mild difficulties in maintaining concentration, persistence, or pace. The ALJ acknowledged that Ms. Landreville has been diagnosed with anxiety, depression, PTSD, and panic attacks. AR 20-21. The medical records contain diagnoses of these conditions as late as 2008. *See, e.g.,* AR 602, 608, 619. On May 16, 2008, Dr. Dyrud noted anxiety, but remarked that Ms. Landreville had no racing thoughts, good attention and concentration, and intact memory and cognition. AR 619. In her May 2009 function report, Ms. Landreville reported that she did not handle stress "real well" but took Xanax for her stress. She also said she did not handle changes in routine well, "but I manage." AR 255. She indicated that she did not have trouble with memory, completing tasks,

understanding, or following instructions. AR 254. Further, Dr. Ziomek concluded that Ms. Landreville is mildly limited in maintaining concentration, persistence, or pace. AR 338. I conclude that these facts, which the ALJ referenced in his decision, are substantial evidence supporting the ALJ's finding that Ms. Landreville is no more than mildly limited in her concentration, persistence, or pace.

Finally, I turn to the ALJ's finding that Ms. Landreville had experienced no episodes of decompensation. "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12(C)(4). Ms. Landreville cites the fact that she dissociated twice after her boyfriend attacked her in late 2006. Dr. Stratton noted that she felt she had "lost the whole day" during both episodes. AR 346. The ALJ was correct in not counting these episodes because they occurred prior to the alleged amended onset date, March 19, 2008. *See, e.g., Barber v. Astrue*, 431 Fed. App'x 709, 713 (10th Cir. 2011) ("ALJ was not required to consider" "alleged decompensation events" that "preceded the alleged onset date"). Further, Ms. Landreville has not cited, and the Court cannot locate, any record evidence suggesting she has experienced episodes of decompensation on or after March 19, 2008. To the contrary, all evidence suggests Ms. Landreville's condition has steadily improved since she dissociated in 2006. Therefore, the ALJ properly concluded that there were no relevant episodes of decompensation.

The ALJ's findings in the four functional areas are therefore supported by substantial evidence. Based on these findings, the ALJ correctly concluded that Ms. Landreville's PTSD is

not severe. As noted, findings of "none" or "mild" in the first three areas and a finding of "none" in the fourth area direct a finding that the claimant's impairment is not severe unless "the evidence otherwise indicates that there is more than a minimal limitation in [her] ability to do basic work activities." 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). For all the reasons discussed above in connection with the four functional areas, substantial evidence supports the conclusion that Ms. Landreville's PTSD does not more than minimally limit her ability to do basic work activities.

Finally, even if the ALJ had erred at step two, his error was harmless. *See Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). This is because the ALJ went on to analyze Ms. Landreville's RFC at step four and concluded that her RFC enabled her to perform past work as an administrative clerk. AR 27. At step four, SSA "asses[es] your residual functional capacity based on all the relevant evidence in your case record . . . including your medically determinable impairments that are not 'severe.'" 20 C.F.R. §§ 404.1545(a)(1)-(2), 416.945(a)(1)-(2). While the ALJ did not extensively discuss Ms. Landreville's PTSD at step four, he did note that "[t]he claimant reported no difficulty getting along with family, friends, neighbors, and authority figures." AR 24. This comment, the ALJ's extensive analysis of Ms. Landreville's PTSD at step two, and the totality of the record convince me that "[t]here is no substantial evidence that would allow a reasonable administrative factfinder to include any mental limitations in [her] RFC." *Alvey v. Colvin*, 536 Fed. App'x 792, 795 (10th Cir. 2013). There is simply no basis to conclude from any of the evidence discussed above that PTSD has more than minimally limited Ms. Landreville's ability to work since her amended alleged onset date of March 19, 2008.

To the extent Ms. Landreville believes the record on how her PTSD limits her ability to work was not sufficiently developed, she cannot be heard to complain at this juncture. She bore the burden of proof at step four and, despite ample opportunity, neither she nor her counsel so much as mentioned PTSD at the hearing. *See Doyal,* 331 F.3d at 760; *Cowan v. Astrue,* 552 F.3d 1182, 1188 (10th Cir. 2008) ("when the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored") (internal citation omitted).

## V. Conclusion

For the foregoing reasons, SSA's decision is AFFIRMED.

DATED: January 28, 2015

BY THE COURT:

   s/Lewis T. Babcock              
LEWIS T. BABCOCK, JUDGE